QUINN EMANUEL URQUHART & SULLIVAN, LLP
Joseph M. Paunovich (Bar No. 228222)
joepaunovich@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443-3000
Fax: (213) 443-3100

Kade A. Allred (*pro hac vice forthcoming*)
kadeallred@quinnemanuel.com
2755 E. Cottonwood Pkwy., Suite 520
Salt Lake City, UT 84121
Telephone: (801) 515-7300
Fax: (801) 515-7400

*Attorneys for Plaintiff Moldex-Metric, Inc.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| MOLDEX-METRIC, INC., a California corporation,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>PROTECTIVE INDUSTRIAL PRODUCTS, INC., a New York corporation,<br><br>　　　　　　Defendant. | Case No. 2:25-cv-08931<br><br>**COMPLAINT FOR:**<br><br>**(1) False Advertising And Unfair Competition (Lanham Act § 43(a));**<br><br>**(2) Unlawful, Unfair, And Fraudulent Business Practices (Bus. & Prof. Code §§ 17200, et seq.);**<br><br>**(3) False Advertising (Bus. & Prof. Code §§ 17500, et seq.).**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Moldex-Metric, Inc. ("Moldex") brings this action against defendant Protective Industrial Products, Inc. ("PIP") arising out of PIP's false, misleading, and deceptive sales and marketing claims for its "BioSoft" earplug products, and Moldex hereby alleges as follows:

## NATURE OF THE ACTION

1.     In a calculated "greenwashing" scheme to capture market share from competitors like Moldex in the hearing protection industry, PIP has intentionally misled and deceived distributors, downstream purchasing companies and end users by falsely advertising its "BioSoft" earplug products with numerous unqualified environmental benefit claims, including, for example, prominent and unqualified claims that the products are "eco-friendly," "sustainable," "bio-based," part of an "eco-series" and potentially renewable or recyclable products.

2.     PIP's marketing of its BioSoft earplug products with such general, unqualified environmental claims conveys to consumers that the products have specific and far-reaching environmental benefits with little or no negative environmental impact.  PIP's intent and the collective effect of its marketing is to create a false, deceptive, and misleading perception that consumers are making a smarter "environmental" choice by buying PIP's products as compared to other products in the hearing protection marketplace.

3.     For example, PIP's prominent and unqualified marketing of BioSoft earplug products as simply "bio-based" is false, deceptive, and misleading in conveying that the products are exclusively comprised of biological material. Similarly, PIP's unqualified marketing of BioSoft earplug products as being comprised of replenishable and sustainable material, is false, deceptive, and misleading and likely to lead reasonable consumers to believe that the products are made entirely with renewable and sustainable materials.

4.     PIP's less prominent qualified "bio-based" statements claiming that its BioSoft products are comprised of "82% bio-based content" only exacerbates the

false, deceptive, and misleading nature of PIP's greenwashing campaign. Independent laboratory testing reveals that PIP's BioSoft products are comprised at best of approximately 40%, and in some instances as low as 5%, bio-based material. In other words, PIP's BioSoft products are overwhelmingly comprised of non-bio-based material, i.e., non-renewable, petroleum-based sources.

5.    PIP's other qualified environmental assertions regarding reduced carbon emissions associated with its BioSoft earplug products, and claims about their decomposition characteristics, similarly lack any legitimate scientific substantiation. In fact, when confronted and asked for documentary evidence of these claims, PIP admitted that its biodegradability claims do not meet the required threshold to claim compliance with the applicable industry standard for decomposition and that PIP has no substantiation for its carbon emissions claims. Despite making these admissions months ago, PIP continues to perpetuate the same false, misleading, and deceptive claims on its website and in its marketing materials for its BioSoft earplug products.

6.    PIP's ongoing false, misleading, and deceptive marketing has caused and continues to cause substantial harm and damages to Moldex, a leading manufacturer of hearing protection products that has built its reputation and goodwill over four decades on trust and reliability. Accordingly, Moldex brings this action to stop PIP's false, misleading, and deceptive marketing practices and to recover damages for the competitive injury it has suffered.

7.    This case demonstrates why greenwashing—the practice of making false, misleading, deceptive, and general and unsubstantiated environmental claims—threatens both fair competition and consumer protection. When companies like PIP falsely market conventional products as environmentally superior, they not only deceive consumers seeking to make responsible purchasing decisions but also undercut honest competitors, like Moldex, who refuse to engage in such deception.

## THE PARTIES

8.    Plaintiff Moldex is a California corporation with its principal place of business at 10111 West Jefferson Boulevard, Culver City, California 90232.  For more than four decades, Moldex has been a leading manufacturer of hearing protection products, including but not limited to foam earplugs.  Moldex's earplugs are widely used in industrial and commercial operations, with Moldex having developed a position of trust and dependability in the market.

9.    Defendant PIP is a New York corporation with its principal place of business at 25 British American Boulevard, Latham, New York 12110.   PIP manufactures, markets, and sells personal protective equipment, including its recently acquired[1] BioSoft earplug products at issue in this action.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1332 (diversity of citizenship); and 28 U.S.C. § 1367 (supplemental jurisdiction).

11.    On information and belief, this Court has personal jurisdiction over Defendant PIP because it conducts business within the State of California and has committed the acts of unfair and deceptive trade practice, unlawful business, and false advertising and unfair competition that have given rise to this action in this district. PIP has established minimum contacts with the forum such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

---

[1]    In late 2023, PIP acquired Final Fit Safety, which had a line of allegedly "sustainable ear plugs" that eventually became PIP's BioSoft line.  *See* Press Release, PIP, *Protective Industrial Products, Inc. Acquires Final Fit Safety, Manufacturer of Sustainable Ear Plugs* (Nov. 13, 2023), https://tinyurl.com/2wzjhd6k.   Upon information and belief, PIP either failed to independently and adequately test and verify the environmental claims for the products it acquired or proceeded to market these claims despite knowing they were unsubstantiated.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because, on information and belief, PIP conducts business within this judicial district and/or a substantial part of the events giving rise to the alleged claims in this action occurred in this judicial district.

## FACTUAL BACKGROUND

### A.    The Parties Compete in the Hearing Protection Market

13.     Moldex and PIP are direct competitors in the market for disposable foam earplugs and other hearing protection products sold throughout the United States, including California.

14.     Both companies market their products to industrial and commercial distributors and companies, among others, who require hearing protection for workplace safety and other uses.

15.     The environmental impact of products in the personal protection equipment industry has become an increasingly important factor in purchasing decisions for hearing protection products, with distributors, companies, and end users seeking products that are sustainable and minimize environmental impact.

### B.    The FTC Green Guides & California Environmental Laws

16.     Given the importance of environmental sustainability to consumers, the Federal Trade Commission promulgated Guides for the Use of Environmental Marketing Claims ("Green Guides"), 16 C.F.R. § 260, that provide guidance to prevent false, misleading, and deceptive environmental marketing claims.

17.     The Green Guides specifically warn that unqualified, general environmental benefit claims like "eco-friendly" likely convey that products have "far-reaching environmental benefits" and "no negative environmental impact," and are deceptive unless the marketer can substantiate these broad claims. *Id.* § 260.4.

18.     The Green Guides further specify that unqualified "made with renewable materials" claims are likely to mislead consumers into believing products are made

-4-

entirely with such materials.  *Id.* § 260.16.

19.    California Business and Professions Code § 17580.5 prohibits any person from making "an untruthful, deceptive, or misleading environmental marketing claim, whether explicit or implied."  This prohibition applies to any claim contained in the FTC's Green Guides.

20.    California Business and Professions Code § 17580(a) requires persons who represent that consumer goods are environmentally beneficial to maintain written documentation supporting the validity of the representation, including the reasons the person believes the representation to be true and any significant adverse environmental impacts associated with the product.  Section 17580(b) requires that this documentation be furnished to any member of the public upon request.

21.    California Public Resources Code § 42357(b) prohibits the sale of products labeled as "decomposable," or in any way implying that the product will decompose in a landfill or other environment unless they comply with specified standards.  Section 42357(d) requires manufacturers, upon public request, to submit within 90 days information and documentation demonstrating compliance with environmental marketing requirements.

22.    As described and shown below, PIP's marketing violates these established standards and statutes by making broad, unqualified environmental claims that are false and cannot be substantiated, and that deceive or at a minimum mislead consumers about the actual environmental attributes of its BioSoft earplug products.

**C.    PIP's False and Misleading Environmental Marketing Campaign**

23.    Beginning in or around 2024, in a calculated effort to capture market share from competitors like Moldex, PIP launched an aggressive marketing campaign for its "BioSoft" earplug line, making sweeping environmental claims that it knew or should have known were false, deceptive, and misleading.

24.    PIP's marketing campaign spans multiple channels—its website (us.pipglobal.com), product inserts, marketing materials, and promotional channels—

1  ensuring maximum exposure to its false, deceptive, and misleading claims by
2  distributors, companies, and consumers.

3      25.    For example, without any legitimate basis, PIP prominently advertises
4  its BioSoft products as "the world's first sustainable bio-based ear plug."[2]



11     26.    PIP also brazenly claims its BioSoft products are "eco-friendly,"
12 "sustainable," "bio-based," and part of an "eco-series"—terms specifically designed
13 to mislead environmentally-conscious consumers.[3]

 



21     27.    PIP marketing also claims that its BioSoft products:

22         a.  "decompose 76% in 180 days" while traditional PU or PVC
23             earplugs remain unchanged;

24         b.  "emit 5.6 times less $CO_2$ carbon emissions than traditional
25             polyurethane foam earplugs";

26  _____

27     [2]   *BioSoft Technology*, PIP, https://tinyurl.com/ucdwe62c (last visited Sept. 18,
28 2025).
       [3]   *BioSoft Ear Plugs*, PIP (May 2025), https://tinyurl.com/ys6747u2.

c. have only "17.49 lbs carbon equivalent emissions per 10,000 pairs of disposable ear plugs";

d. are "82% bio-based"; and

e. offer a "lower carbon footprint," "reduce emissions," and are "more environmentally friendly."

28. These unqualified and unsubstantiated general and specific environmental benefit claims, taken individually and collectively, create the false and misleading net impression that PIP's BioSoft products are environmentally beneficial, have far-reaching environmental benefits, and have minimal or no negative environmental impact.

**D. Moldex Demands the Truth**

29. Unable to compete fairly against PIP's false environmental claims, Moldex was forced to take action. On March 18, 2025, Moldex demanded proof supporting PIP's environmental marketing claims. Ex. A (Moldex's Mar. 18 Letter).

30. Moldex's March 18, 2025 letter specifically identified PIP's problematic claims and cited California Business and Professions Code § 17580(b), California Public Resources Code § 42357(d), and Washington Revised Code § 70A.455.080, which require scientific substantiation for environmental marketing claims.

31. Moldex demanded that PIP provide information and documentation to substantiate the scientific truth and accuracy of each claim by April 15, 2025.

**E. PIP's Evasive and Inadequate Response**

32. PIP responded on April 14. Its response conspicuously failed to substantiate any of its false, deceptive, and misleading environmental claims. Ex. B (PIP's Apr. 14 Letter).

33. Regarding its general, unqualified, and specific "bio-based" and "82% bio-based content" claims, PIP doubled down on its claims, citing independent testing performed by Beta Analytic before PIP acquired Final Fit Safety and the BioSoft

product line.  The letter did not specify whether the tested products differed from PIP's current commercial BioSoft products.

34.    Regarding its decomposition claims, PIP claimed that a German certification company tested its earplugs from March 2022 to May 2022—before PIP acquired Final Fit Safety and the product line—under EN 13432 (a European industrial standard).  PIP represented that the testing resulted in 76.1% mineralization of earplug material after 180 days, which falls short of the EN 13432 requirement of 90% biodegradation within 180 days in commercial composting conditions.

35.    PIP provided no substantiation for its carbon emissions claims or comparative environmental benefits—because no such substantiation existed.

**F.    Moldex's Continued Pursuit of the Truth**

36.    Moldex sent a follow-up letter on May 16, 2025, asserting that PIP had failed to provide the requested information and documentation as required by law. Ex. C (Moldex's May 16 Letter).

37.    Moldex noted that the testing documents PIP provided were for different products and materials than PIP's commercially offered BioSoft earplugs.  Moldex noted that all testing was commissioned by Nanosystems (not PIP or its predecessor) for products labeled "Bio D Foam" or "BioNanopol" tested between 2020–2022. Moldex challenged whether these tested materials were actually the same as PIP's current BioSoft products and demanded evidence proving product equivalency, noting PIP had recently acquired the product line and questioning whether any independent verification had been conducted.  Moldex further noted that the testing results showed variability of +/- 3%, which PIP does not disclose in its advertising, and that the bio-based percentage is likely less because the testing was not conducted on stem and cord materials of PIP's earplug products.

38.    In response to PIP's documentation of "76% decomposition in 180 days" (based on testing under EN 13432), Moldex challenged multiple critical deficiencies in PIP's marketing claims.  **_First_**, PIP's internal documentation explicitly

stated the result "does not meet the limit specified by the UNI EN 13432 standard," yet PIP's advertising suggests that its products are in compliance "when tested in accordance with EN 13432" without disclosing this failure. **Second**, Moldex noted the EN 13432 standard is specifically for industrial composting of packaging, not earplugs, and PIP failed to disclose the standard's inapplicability to its products. **Third**, PIP did not test cord and stem components that differ from the earplug material, violating FTC Green Guides requirements that all product materials must decompose similarly. **Fourth**, PIP omitted FTC-required qualifiers about whether products are compostable at home or only in industrial facilities, and if the latter, whether such facilities are available to a substantial majority of consumers. **Finally**, Moldex noted that PIP provided no testing under the ASTM D6400 standard, as required by California Public Resources Code § 42355(d), for decomposition claims.

39.    Additionally, despite PIP's marketing claims that it "conducted carbon footprint analyses" demonstrating "5.6 times less CO2 compared to traditional polyurethane foam earplugs" and "17.49 lbs carbon equivalent emissions per 10,000 pairs," Moldex emphasized that PIP failed to provide any actual documentation or evidence supporting these specific carbon emission reduction claims.

40.    Regarding PIP's sweeping, unqualified general environmental benefit claims that BioSoft products are "sustainable," "environmentally friendly," "bio-based," "eco-friendly," and supposedly "reduce emissions" and "lower carbon footprint," Moldex pointed out that PIP's limited earthworm and plant toxicity testing cannot substantiate such broad environmental marketing claims. Moldex cited FTC Green Guides, 16 C.F.R. § 260.4(b), warning that such general environmental benefit claims are "highly unlikely" to be substantiated because marketers cannot verify "all reasonable consumer interpretations of these claims."

41.    Moldex further noted that PIP's products are neither renewable nor recyclable, and that PIP failed to provide any qualifying statements identifying specific environmental benefits or the specific materials supposedly imparting "eco-

friendly" or "sustainable" benefits.    Moldex demanded evidence specifically supporting each broad environmental claim.

**G.    PIP Responds to Moldex's May 16 Letter**

42.    In its July 7 response, Ex. D, PIP made several critical admissions confirming the fraudulent nature of its marketing campaign:

      a.  PIP acknowledged that its 76% decomposition claim "does not meet the 90% threshold for EN 13432 certification" (*id.* at 2);

      b.  PIP conceded that "the presence of petrochemical content in the stem and cord should be clearly disclosed" (*id.*);

      c.  PIP acknowledged that "while internal calculations related to carbon emissions were explored, we have not published or relied upon quantitative carbon emissions claims in public marketing" (*id.*);

      d.  PIP recognized "the importance of avoiding unqualified broad claims" (*id.* at 3).

43.    Remarkably, even while admitting to its deception, PIP attempted to perpetuate the fraud by providing more recent testing data from Beta Analytic supposedly from July 2024 and supposedly on the foam material used in PIP's BioSoft earplug products, which purportedly showed 85–89% biobased content (*id.* at 2).

**H.    Independent Testing Reveals the Falsity of PIP's Advertising**

44.    After receiving PIP's response, in which it admitted it could not substantiate its carbon emissions claims and that its decomposition testing failed to meet required standards—Moldex took the extraordinary step of commissioning independent testing of PIP's products.    Moldex purchased multiple samples of PIP's commercially available BioSoft products from large, national authorized dealers and distributors.    These products were purchased in the same manner and from the same commercial distribution channels that industrial and commercial end users would obtain them.    Moldex submitted these samples to Beta Analytic, Inc., the same

ISO/IEC 17025:2017-accredited testing laboratory PIP (and its predecessor) claimed to have used for their own testing.

45.    Beta Analytic's testing revealed the truth.  The results showed that the tested BioSoft products contain at best approximately **40%**, and as low as **5%**, biobased content—a miniscule fraction of PIP's advertised 82% claim.  Ex. E at 1 (Beta Analytic Results Summary).  The testing revealed significant variations in biobased carbon content across samples, but even the highest figures are significantly below, and directly contradict, PIP's core marketing claim that the BioSoft foam material is "82% bio-based."

| Sample # | Beta Report # | Sample ID | Product Type | Bio-based Content | Variance from 82% Claim |
|---|---|---|---|---|---|
| 1 | 764988 | BSB-A | Bullet | 14% | -68% |
| 2 | 764989 | BSB-B | Bullet | 37% | -45% |
| 3 | 764992 | BSPFB-A | Pinch fit, stem, and foam plug | 38% | -44% |
| 4 | 764995 | BSPFB-B | Pinch fit, stem, and foam plug | 11% | -71% |
| 5 | 764991 | BSPFF-A | Pinch fit, foam plug | 38% | -44% |
| 6 | 764994 | BSPFF-B | Pinch fit, foam plug | 14% | -68% |
| 7 | 764990 | BSPFS-A | Pinch fit, stem | 40% | -42% |
| 8 | 764993 | BSPFS-B | Pinch fit, stem | 5% | -77% |
| **Average** | | | | **25%** | **-57%** |
| **Range** | | | | **5–40%** | |

46.    PIP cannot truthfully advertise all products as "82% bio-based" when independent testing reveals bio-based content at best from 5% to 40%.  PIP knew or should have known through reasonable diligence that its environmental claims were false and misleading.  The dramatic variation between PIP's claimed test results and

-11-

marketing claims regarding percent bio-based content (82%) and independent testing commissioned by Moldex (showing 5–40% bio-based content) cannot be explained by normal testing variations or margins of error.  Moldex used the same laboratory, Beta Analytic, that PIP (and its predecessor) used.   And Beta Analytic's own measurements show precision of ±0.06 to ±0.15 pMC—less than 1% variance—yet PIP's products vary by 35 percentage points (5% to 40%) using the identical test method.   This stark discrepancy strongly suggests that PIP or its predecessor knowingly submitted different products for testing to fraudulently obtain higher bio-based content results that it knows are differently formulated than its commercially available BioSoft earplug products.

47.    When consumers purchase earplugs marketed as "82% bio-based" and bearing "eco-friendly" claims, they reasonably expect these environmental benefits to be substantiated and based on real scientific data.  In reality, consumers of PIP's BioSoft earplug products are receiving products that contain between 5% to 40% bio-based content—meaning they contain between 60% to 95% non-bio-based materials. The dramatic variability in test results demonstrates that PIP's uniform "82%" claim is false regardless of which product a consumer receives.   A consumer buying products advertised as "82% bio-based" is actually receiving products that are as much as 95% non-renewable, petroleum-based.  This fact also demonstrates that PIP's decomposition claims are likely equally fraudulent and based on materials that are not actually in their commercial products.  On information and belief, products that are 95% petroleum-based will not and indeed cannot decompose 76.1% in 180 days as PIP claims in marketing for its BioSoft products, much less 90% as required by the EN 13432 standard.  PIP's calculated decision to make environmental claims that cannot be substantiated for any of its products is by definition deliberately false, deceptive, misleading, and obviously designed to capture market share from environmentally conscious consumers.

## I.    Ongoing Fraud and Continuing Harm

48.    Despite PIP's acknowledgements that it would revise its website and marketing materials to correct any false, deceptive, or misleading claims, no material revisions have taken place in the months that have passed since PIP's July 7 letter. Instead, PIP's website continues to make the same false environmental claims it previously admitted were unsubstantiated.

49.    For example, the landing page for BioSoft has no noticeable differences.[4]



*March 2025*



*Current Version (as of Sept. 18, 2025)*

50.    Likewise, the BioSoft brochure that currently appears on PIP's website is the same version that appeared earlier this year on PIP's website.[5]

---

[4]    *Compare* screenshot of the BioSoft landing page from March 2025, *with BioSoft Technology*, PIP, https://tinyurl.com/ucdwe62c (last visited Sept. 18, 2025).

[5]    *See BioSoft Ear Plugs*, PIP (May 2025), https://tinyurl.com/ys6747u2 (can also access on landing page (https://tinyurl.com/ucdwe62c) by clicking "View Brochure").

-13-



*Screenshot from Sept. 18, 2025*

*Screenshot from May 22, 2025*

51.    Thus, the misrepresentations Moldex previously identified are still being parroted by PIP to unsuspecting consumers—notwithstanding independent data that debunks PIP's claims.

52.    PIP's false and misleading environmental claims have provided and

-14-

continue to provide PIP with an unfair competitive advantage in the marketplace.

53. Consumers purchasing PIP's BioSoft products based on environmental claims are being deceived about the true environmental attributes of the products and continue to be victimized by PIP's deceptions.

54. Moldex has been and continues to be harmed by PIP's false and misleading environmental marketing claims, which divert sales from Moldex's competing products.

55. Five months after being confronted by Moldex, and despite its own admissions of noncompliance, PIP has failed to timely remove or correct its false and misleading environmental claims, instead choosing to continue deliberately deceiving consumers with its false environmental claims—demonstrating a callous disregard for both the law and consumer protection that demands immediate judicial intervention.

## **FIRST CAUSE OF ACTION**

### **False Advertising & Unfair Competition, Lanham Act § 43(a)**

56. Moldex repeats, realleges, and incorporates herein by reference the allegations contained in the preceding paragraphs as if fully set forth here.

57. Section 43(a) of the Lanham Act provides that it is unlawful to use false or misleading statements of fact in connection with goods or services offered in commerce. 15 U.S.C. § 1125(a)(1)(B) states:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

58. In selling its BioSoft products, PIP has engaged in, and continues to engage in, false advertising and unfair competition in violation of Section 43(a) of the Lanham Act. Specifically, PIP falsely advertises its BioSoft products as "82% bio-

based," "sustainable," "eco-friendly," "the world's first sustainable bio-based ear plug," and claims they "decompose 76% in 180 days," which constitutes deceptive and misleading representations in violation of the Lanham Act.

59.    On information and belief, PIP's labeling, marketing, sales calls, and product displays at trade shows have misrepresented the nature, characteristics, or qualities of their product by falsely alleging environmental benefits and bio-based content that independent testing has proven to be materially false.

60.    By making such misrepresentations about their product, PIP has engaged in false advertising under 15 U.S.C. §1125(a)(1)(B), and PIP's conduct has created deception among consumers and members of the general public as to the nature, characteristics, or qualities of their products.

61.    Upon information and belief, PIP's false advertisements were circulated throughout the United States in interstate commerce and falsely misrepresent the nature, characteristics, or qualities of the BioSoft earplugs, or create a substantial likelihood of confusion regarding the nature, characteristics, or qualities of the BioSoft products.  These statements are material, are explicitly and/or impliedly false, and violate 15 U.S.C. § 1125(a)(1)(B).

62.    PIP's false and misleading statements are likely to mislead and deceive consumers into purchasing the BioSoft products instead of Moldex products.  PIP's conduct is willful, deliberate, and in bad faith.

63.    PIP's illegal conduct is continuous and ongoing, and Plaintiff is suffering and will continue to suffer irreparable harm, for which Moldex has no adequate remedy at law, unless PIP is enjoined from making false and misleading statements regarding the environmental characteristics of the BioSoft products.

64.    As a direct and proximate result of PIP's acts of unfair competition and false advertising, Moldex has suffered and will continue to suffer actual harm to its business, reputation, and goodwill.

COMPLAINT

## SECOND CAUSE OF ACTION

### Violation of Cal. Bus. & Pro. Code §§ 17200 et seq.

65.    Moldex repeats, realleges, and incorporates herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth here.

66.    As alleged above, PIP has made and continues to make false and unsubstantiated environmental marketing claims about its BioSoft products, including claims about bio-based content, biodegradability, carbon emissions, and general environmental benefits.

67.    As alleged above, independent testing revealed that BioSoft products contain only 5-40% bio-based content, not the advertised 82%, and PIP has admitted it cannot substantiate its carbon emissions claims or broad environmental benefit claims.

68.    PIP's practices constitute an unlawful business act in violation of California Business and Professions Code §§ 17200 et seq. because PIP is violating California Business and Professions Code § 17580(b), California Public Resources Code § 42357(d), and the FTC Green Guides by making unsubstantiated environmental marketing claims.

69.    PIP's practices constitute unfair, deceptive, untrue, or misleading advertising in violation of California Business and Professions Code §§ 17200 et seq. because it utilizes false or misleading statements and claims about the environmental nature and quality of their BioSoft products.

70.    PIP's practices constitute an unfair business act in violation of California Business and Professions Code §§ 17200 et seq. because it is utilizing knowingly false or misleading statements and claims about the environmental attributes of its BioSoft products, as demonstrated by PIP's own admissions that its claims lack substantiation.

71.    PIP's practices constitute a fraudulent business act in violation of California Business and Professions Code §§ 17200 et seq. because PIP continues to

make environmental claims it has admitted are unsubstantiated, likely to deceive members of the public.

72.    PIP's practices constitute unfair competition in violation of Business and Professions Code §§ 17200 et seq. because (1) they are unlawful, unfair or fraudulent, and (2) they involve unfair, deceptive, untrue or misleading advertising and other acts prohibited by Chapter 1 (commencing with § 17500) of Part 3 of Division 7 of the Business and Professions Code, including:

    a.  California Business and Professions Code § 17580.5, which prohibits untruthful, deceptive, or misleading environmental marketing claims, whether explicit or implied, including claims contained in the FTC's Green Guides;

    b.  California Business and Professions Code § 17580(a) and (b), which require persons making environmental representations to maintain written documentation supporting the validity of the representation and furnish such documentation to the public upon request;

    c.  California Public Resources Code § 42357(b), which prohibits the sale of products labeled as "biodegradable," "degradable," or "decomposable" unless they comply with specified standards, and § 42357(d), which requires manufacturers to provide compliance documentation within 90 days upon public request;

    d.  16 C.F.R. § 260.2, which requires that environmental marketing claims be substantiated by competent and reliable scientific evidence and that marketers ensure all reasonable interpretations of their claims are truthful and supported; and

    e.  16 C.F.R. § 260.4, § 260.8, and § 260.16 (FTC Green Guides provisions regarding general environmental benefit claims, degradable claims, and renewable materials claims).

-18-

73.     Each sale of PIP's falsely advertised BioSoft products in California constitutes a separate violation of the statutes enumerated above.  These violations demonstrate the systematic and pervasive nature of PIP's unlawful practices.

### THIRD CAUSE OF ACTION

### Violation of Cal. False Advertising, Common Law & Cal. Bus. & Pro. Code §§ 17500 et seq.

74.     Moldex repeats, realleges, and incorporates herein by reference the allegations contained in the preceding paragraphs as if fully set forth here.

75.     PIP's statements regarding the environmental attributes of its BioSoft products, including but not limited to claims that the products are "82% bio-based," "sustainable," "eco-friendly," and "decompose 76% in 180 days," constitute untrue and/or misleading advertising, which it knew or should have known were untrue at the time the statements were made, and therefore violate California Business and Professions Code Section §§ 17500 et seq.

76.     PIP's false advertising has injured and continues to injure Moldex with no adequate remedy at law.  Moldex is entitled to a permanent injunction prohibiting PIP's wrongful conduct.

77.     Each sale of PIP's falsely advertised BioSoft products in California constitutes a separate violation of the statutes enumerated above.  These violations demonstrate the systematic and pervasive nature of PIP's unlawful conduct and support Moldex's claims for injunctive relief and restitution.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

i.     Enter judgment in favor of Moldex and against PIP on all causes of action;

-19-

ii.    Enter judgment that PIP has competed unfairly pursuant to the Lanham Act, 15 U.S.C. § 1125(a), and the common law, and be permanently enjoined from continuing such conduct;

iii.    Enter judgment that PIP has competed unfairly under California Business and Professions Code §§17200, et seq. and advertised falsely under §§ 17500, et seq.;

iv.    Issue a preliminary and permanent injunction, pursuant to California Business and Professions Code § 17203, enjoining PIP from any further act of unfair competition;

v.    Issue a preliminary and permanent injunction requiring PIP to issue corrective advertising to remedy consumer deception caused by its false environmental claims and to require PIP to notify its distributors and retailers of the falsity of its environmental claims and to recall all marketing materials containing false claims;

vi.    Award Moldex its actual damages in an amount to be proven at trial; and

vii.    Grant such other and further relief as this Court may deem just and proper.

## **REQUEST FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues.

-20-

Dated:  September 18, 2025

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By:  /s/ *Joseph M. Paunovich*
Joseph M. Paunovich (Bar No. 228222)
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443-3000
Fax: (213) 443-3100
joepaunovich@quinnemanuel.com

Kade A. Allred (*pro hac vice forthcoming*)
kadeallred@quinnemanuel.com
2755 E. Cottonwood Pkwy., Suite 520
Salt Lake City, UT 84121
Telephone: (801) 515-7300
Fax: (801) 515-7400

*Attorneys for Plaintiff Moldex-Metric, Inc.*

COMPLAINT