QUINN EMANUEL URQUHART & SULLIVAN, LLP
Joseph M. Paunovich (Bar No. 228222)
joepaunovich@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443-3000
Fax: (213) 443-3100

Kade A. Allred (*pro hac vice*)
kadeallred@quinnemanuel.com
2755 E. Cottonwood Pkwy., Suite 520
Salt Lake City, UT 84121
Telephone: (801) 515-7300
Fax: (801) 515-7400

*Attorneys for Plaintiff Moldex-Metric. Inc.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| MOLDEX-METRIC, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>PROTECTIVE INDUSTRIAL PRODUCTS, INC., a New York corporation,<br><br>Defendant. | Case No. 2:25-cv-08931-FMO-E<br><br>**AMENDED COMPLAINT FOR:**<br><br>**(1) False Advertising And Unfair Competition (Lanham Act § 43(a));**<br><br>**(2) Unlawful, Unfair, And Fraudulent Business Practices (Bus. & Prof. Code §§ 17200, et seq.);**<br><br>**(3) False Advertising (Bus. & Prof. Code §§ 17500, et seq.).**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Moldex-Metric, Inc. ("Moldex") brings this action against defendant Protective Industrial Products, Inc. ("PIP") arising out of PIP's false, misleading, and deceptive sales and marketing claims for its "BioSoft" earplug products, and Moldex hereby alleges as follows:

## NATURE OF THE ACTION

1. Moldex, a leading manufacturer of foam earplugs for over four decades, brings this action to halt PIP's calculated "greenwashing" scheme to capture foam earplug market share through false and misleading environmental claims about its "BioSoft" foam earplug products and to recover damages for the resulting competitive injury.

2. Moldex and PIP are direct competitors in the foam earplug market, selling their products through the same distribution channels where they compete head-to-head for the same customers. Because foam earplugs are functionally interchangeable products regardless of material composition, purchasing decisions are driven by factors such as price, brand reputation, performance specifications, and marketing claims, including environmental attributes.

3. PIP falsely advertises its BioSoft foam earplug products as being comprised of 82% bio-based content and the more environmentally friendly choice as compared to polyurethane foam earplugs. In fact, PIP's false, misleading, and deceptive environmental marketing campaign prominently features unqualified claims that its products are "the world's first sustainable bio-based ear plug" and "eco-friendly." PIP markets its BioSoft products as environmentally superior to "traditional PU [polyurethane]" earplugs, like those offered by Moldex, and "PVC [polyvinyl chloride] earplugs," claiming BioSoft provides "the same fit and performance" but "with a lower carbon footprint" and decomposition capabilities that traditional polyurethane or PVC earplugs allegedly lack.

4. These claims are false. Most egregiously, PIP claims its BioSoft products are compromised of "82% bio-based" content. However, multiple

-1-

independent laboratory tests commissioned by Moldex on PIP's commercially sold BioSoft products bearing this environmental claim, using the same laboratory and methodology PIP allegedly relied upon to substantiate the 82% bio-based claim, reveal that PIP's BioSoft foam earplug products contain only 5–40% bio-based content. In other words, PIP's 82% bio-based claim concerning the BioSoft foam earplug products is literally false. PIP's BioSoft foam earplug products are in reality 60–95% petroleum-based, essentially identical from an environmental standpoint to traditional polyurethane foam or PVC-based earplugs that PIP directly and falsely markets its BioSoft earplugs against as allegedly environmentally superior.

5. PIP's marketing of its BioSoft products with these environmental claims is designed to create a false perception that consumers are making a smarter environmental choice by buying PIP's BioSoft products as compared to traditional polyurethane foam or PVC-based earplug products in the foam earplug marketplace.

6. PIP's prominent, literally false and/or unqualified marketing of BioSoft products as "82% bio-based" or more generally simply "bio-based" is false and misleading in conveying that the products are exclusively or substantially comprised of biological material. Similarly, PIP's unqualified claims that BioSoft products are exclusively or substantially from a "replenishable source" and are comprised exclusively or substantially of "sustainable material" falsely lead reasonable distributors and consumers to believe the products are made entirely or substantially with renewable and sustainable materials.

7. When PIP acquired the BioSoft product line from smaller competitor Final Fit Safety in late 2023, the product line had minimal market presence. Following PIP's aggressive false advertising campaign featuring unsubstantiated and false environmental claims, on information and belief, BioSoft sales have increased substantially. This represents a substantial harm and direct competitive loss to Moldex, a company that has built its reputation over four decades on trust and reliability. In fact, distributors and customers have frequently inquired whether

-2-

Moldex's foam earplug products are as environmentally friendly as PIP's BioSoft foam earplug products and, on information and belief, sales have been lost and diverted to PIP as a direct result of PIP's false, misleading, and deceptive environmental claims.

8.      In addition to its literally false 82% bio-based claim, PIP has admitted that its decomposition testing "does not meet the 90% threshold for EN 13432 certification."   As for its carbon emissions claims, PIP has acknowledged that "internal calculations related to carbon emissions were explored" but claims it has "not published or relied upon quantitative carbon emissions claims in public marketing"—despite its website prominently featuring claims that BioSoft products emit "5.6 times less $CO_2$ carbon emissions than traditional polyurethane foam earplugs" like those manufactured and sold by Moldex.

9.      Despite being confronted in March 2025 with demands for substantiation and making these critical admissions in its July 2025 response, PIP has continued to make the same false environmental claims on its website and marketing materials, and continues to divert sales from Moldex on the basis of PIP's false, misleading and deceptive environmental claims.

10.      This case demonstrates why greenwashing—the practice of making false, misleading, and unsubstantiated environmental claims—threatens both fair competition and consumer protection.   When companies like PIP falsely market conventional petroleum-based products as environmentally superior, they not only deceive consumers seeking to make responsible purchasing decisions but also undercut honest competitors like Moldex who refuse to engage in such deception.

## THE PARTIES

11.      Plaintiff Moldex is a California corporation with its principal place of business at 10111 West Jefferson Boulevard, Culver City, California 90232.   For more than four decades, Moldex has been a leading manufacturer of hearing protection products, including but not limited to foam earplugs.   Moldex's foam earplugs are

-3-

AMENDED COMPLAINT

widely used in industrial and commercial operations, with Moldex having developed a position of trust and dependability in the market.

12. Defendant PIP is a New York corporation with its principal place of business at 25 British American Boulevard, Latham, New York 12110. PIP manufactures, markets, and sells personal protective equipment, including its recently acquired[1] BioSoft foam earplug products at issue in this action.

### JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1332 (diversity of citizenship); and 28 U.S.C. § 1367 (supplemental jurisdiction).

14. On information and belief, this Court has personal jurisdiction over Defendant PIP because it conducts business within the State of California and has committed the acts of unfair and deceptive trade practice, unlawful business, and false advertising and unfair competition that have given rise to this action in this district. PIP has established minimum contacts with the forum such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

15. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because, on information and belief, PIP conducts business within this judicial district and/or a substantial part of the events giving rise to the alleged claims in this action occurred in this judicial district.

---

[1] In late 2023, PIP acquired Final Fit Safety, which had a line of allegedly "sustainable ear plugs" that eventually became PIP's BioSoft line. *See* Press Release, PIP, *Protective Industrial Products, Inc. Acquires Final Fit Safety, Manufacturer of Sustainable Ear Plugs* (Nov. 13, 2023), https://tinyurl.com/2wzjhd6k.    On information and belief, PIP either failed to independently and adequately test and verify the environmental claims for the products it acquired or proceeded to market these claims despite knowing they were unsubstantiated and literally false.

-4-

# FACTUAL BACKGROUND

## A.   The Parties Compete in the Foam Earplug Market

16.   The hearing protection industry consists of three primary product categories: earmuffs, nonfoam earplugs, and foam earplugs. This action concerns the foam earplug market.

17.   The foam earplug market is characterized by multiple manufacturers offering competing products through common distribution channels. On information and belief, each manufacturer utilizes its own proprietary foam formulation, which may include polyurethane (PU), polyvinyl chloride (PVC), or other materials. Moldex's foam earplugs are manufactured using traditional polyurethane foam material.

18.   Despite differences in proprietary formulations, foam earplugs are not meaningfully distinct or differentiated in the marketplace based on their material composition. Rather, they compete directly as functionally interchangeable products within a single product category. Consumers purchasing foam earplugs are presented with various options and make purchasing decisions based on factors such as price, brand reputation, performance specifications, availability, and marketing claims—including environmental claims.

19.   The environmental impact of products in the personal protection equipment industry has become an increasingly important factor in purchasing decisions for hearing protection products, including but not limited to foam earplugs, with distributors, companies, and end users seeking products that are more sustainable and minimize environmental impact.

20.   Moldex and PIP are direct competitors in this foam earplug market, with products marketed and sold throughout the United States, including California. Both companies market their products to industrial and commercial distributors and end users, among others, who require foam earplug hearing protection products for workplace safety and other uses.

-5-

21.    Both Moldex and PIP sell their foam earplugs through the same distribution channels, including major industrial distributors such as Airgas, Grainger, Fastenal, Magid, MSC, Safewerks, among others.  These distributors present foam earplugs within a single product category.  Products are sold head-to-head in direct competition, with Moldex and PIP earplugs often appearing side-by-side on distributor websites and in catalogs within the same "hearing protection" or "foam earplugs" category.

22.    For example, as shown on Airgas's website,[2] Moldex and BioSoft products are marketed and compete head-to-head in the same foam earplug category:

| | | | |
|---|---|---|---|
| | Moldex® Softies® Tapered Foam Corded Earplugs<br>Airgas Part #: MOL6650 | ⚠ Provide your delivery zip code or log into your account to get up-to-date product availability, pricing and delivery options. | $39⁰⁰ / Box<br>Change Package Size<br>**ADD TO CART** |
| | Protective Industrial Products Mega Bullet™ BioSoft™ Tapered Foam Uncorded Earplugs (200 Pairs Per Box)<br>Airgas Part #: PIPBSF-1 | ⚠ Provide your delivery zip code or log into your account to get up-to-date product availability, pricing and delivery options. | $36⁹⁹ / Box<br>Change Package Size<br>**ADD TO CART** |
| | Protective Industrial Products Mega Bullet™ BioSoft™ Tapered Foam Corded Earplugs (100 Pairs Per Box)<br>Airgas Part #: PIPBSF-30 | ⚠ Provide your delivery zip code or log into your account to get up-to-date product availability, pricing and delivery options. | $37⁸² / Box<br>Change Package Size<br>**ADD TO CART** |
| | Protective Industrial Products Pinchfit™ BioSoft™ Tapered Push-In Foam Corded Earplugs (100 Pairs Per Box)<br>Airgas Part #: PIPPF-30 | ⚠ Provide your delivery zip code or log into your account to get up-to-date product availability, pricing and delivery options. | $68⁰⁶ / Box<br>Change Package Size<br>**ADD TO CART** |

---

[2] *Earplugs*, Airgas, https://tinyurl.com/5dmb93yd (last visited Dec. 4, 2025) (listing earplug products filtered by manufacturer Protective Industrial Products and Moldex-Metric Inc.; product names BioSoft™, Pura-Fit®, and Softies®; and both corded and uncorded disposable earplug types).

23.    The same is true of Grainger's[3] website, which markets Moldex and BioSoft products head-to-head in the same foam earplug category:



24.    Fastenal's website[4] provides another example of marketing Moldex and PIP (including BioSoft) earplugs head-to-head in the foam earplug market:



---

[3]  *Earplugs*, Grainger, https://tinyurl.com/2cevutp4 (last visited Dec. 4, 2025) (filtered for bullet-shaped earplugs from BioSoft and Moldex brands).

[4]  *Disposable Earplugs*, Fastenal, https://tinyurl.com/3zyysbzs (last visited Dec. 4, 2025) (filtered for PIP and Moldex brand earplugs, sorted by price low to high).

25.    MSC[5] likewise markets Moldex and BioSoft earplugs head-to-head in the foam earplug category:



26.    As another example, Safewerks[6] also markets Moldex and BioSoft earplugs in similar fashion:



[5]    *Earplugs*, MSC Direct, https://tinyurl.com/vx8anjcp (last visited Dec. 4, 2025) (filtered for disposable earplugs from Moldex and PIP brands, sorted by price).

[6]    *Earplugs*, Safewerks, https://tinyurl.com/y6zu9z2c (last visited Dec. 4, 2025) (filtered for Final Fit Safety and Moldex brands, sorted by best-selling).

-8-

27. Foam earplugs from different manufacturers are fungible and interchangeable products that compete for the same purchasers' dollars. While specific foam earplug products may vary in features such as shape, size, and noise reduction rating, purchasers seeking foam earplugs view products from various manufacturers as competing alternatives within the same market. Sales gained by one manufacturer through false environmental marketing claims come at the expense of competitors like Moldex. In this market, where products are sold through the same distribution channels and within the same product category, each sale of PIP's falsely advertised BioSoft products is a sale diverted from Moldex and other competitors in the foam earplug market.

**B.    The FTC Green Guides & California Environmental Laws**

28. Given the importance of environmental sustainability to consumers, the Federal Trade Commission promulgated Guides for the Use of Environmental Marketing Claims ("Green Guides"), 16 C.F.R. § 260, that provide guidance to prevent false, misleading, and deceptive environmental marketing claims.

29. The Green Guides specifically warn that unqualified, general environmental benefit claims like "eco-friendly" likely convey that products have "far-reaching environmental benefits" and "no negative environmental impact," and are deceptive unless the marketer can substantiate these broad claims. *Id.* § 260.4.

30. The Green Guides further specify that unqualified "made with renewable materials" claims are likely to mislead consumers into believing products are made entirely with such materials. *Id.* § 260.16.

31. California Business and Professions Code § 17580.5 prohibits any person from making "an untruthful, deceptive, or misleading environmental marketing claim, whether explicit or implied." This prohibition applies to any claim contained in the FTC's Green Guides.

-9-

32. California Business and Professions Code § 17580(a) requires persons who represent that consumer goods are environmentally beneficial to maintain written documentation supporting the validity of the representation, including the reasons the person believes the representation to be true and any significant adverse environmental impacts associated with the product. Section 17580(b) requires that this documentation be furnished to any member of the public upon request.

33. California Public Resources Code § 42357(b) prohibits the sale of products labeled as "decomposable," or in any way implying that the product will decompose in a landfill or other environment unless they comply with specified standards. Section 42357(d) requires manufacturers, upon public request, to submit within 90 days information and documentation demonstrating compliance with environmental marketing requirements.

34. As described and shown below, PIP's marketing violates these established standards and statutes by making broad, unqualified environmental claims that are false and cannot be substantiated, and that deceive or at a minimum mislead consumers about the actual environmental attributes of its BioSoft earplug products.

**C. PIP's False and Misleading Environmental Marketing Campaign**

35. Beginning in or around 2024, in a calculated effort to capture foam earplug market share from competitors like Moldex, PIP launched an aggressive marketing campaign for its "BioSoft" earplug line, making sweeping environmental claims that it knew or should have known were false, deceptive, and misleading.

36. PIP's marketing campaign spans multiple channels—its website (us.pipglobal.com), product inserts, marketing materials, and promotional channels—ensuring maximum exposure to its false, deceptive, and misleading claims by distributors, companies, and consumers.

-10-

37.    For example, without any legitimate basis, PIP prominently advertises its BioSoft products as "the world's first sustainable bio-based ear plug."[7]



38.    PIP also brazenly claims its BioSoft products are "eco-friendly," "sustainable," "bio-based," and part of an "eco-series"—terms specifically designed to mislead environmentally-conscious consumers.[8]





39.    PIP marketing also claims that its BioSoft products:

    a.  "decompose 76% in 180 days" while traditional PU or PVC earplugs remain unchanged;

    b.  "emit 5.6 times less $CO_2$ carbon emissions than traditional polyurethane foam earplugs";

---

[7]  *BioSoft Technology*, PIP, https://tinyurl.com/ucdwe62c (last visited Dec. 8, 2025).

[8]  *BioSoft Ear Plugs*, PIP (May 2025), https://tinyurl.com/ys6747u2.

-11-

c. have only "17.49 lbs carbon equivalent emissions per 10,000 pairs of disposable ear plugs";

d. are "82% bio-based"; and

e. offer a "lower carbon footprint," "reduce emissions," and are "more environmentally friendly."

40. These unqualified and unsubstantiated general and specific environmental benefit claims, taken individually and collectively, create the false and misleading net impression that PIP's BioSoft products are environmentally beneficial, have far-reaching environmental benefits, and have minimal or no negative environmental impact.

41. These claims also specifically target traditional polyurethane foam earplugs—the material used in Moldex's products. PIP's marketing materials explicitly compare BioSoft products against "traditional PU or PVC earplugs," stating that BioSoft products "will decompose 76% in 180 days" while "[t]raditional PU or PVC ear plugs will remain unchanged." PIP's website further claims that BioSoft foam "provides the same fit and performance as conventional polyurethane or PVC materials, but with a lower carbon footprint."

42. PIP's comparative statements denigrating "traditional PU or PVC earplugs" are direct competitive attacks on Moldex's polyurethane foam earplugs. By explicitly positioning BioSoft as environmentally superior to polyurethane foam earplugs, like those manufactured by Moldex, PIP directly competes head-to-head for the same sales.

43. Yet, as shown below, PIP's BioSoft products are overwhelmingly composed of the same petroleum-based, non-renewable materials as traditional earplugs, giving PIP an illegitimate competitive advantage based on false environmental claims.

-12-

AMENDED COMPLAINT

**D. PIP Disseminates and Amplifies Its False Environmental Claims Through Distribution Channels**

44. PIP's false environmental marketing has not been confined to PIP's own website and marketing materials. PIP has systematically disseminated its false environmental claims throughout the market's distribution network. Distributors and resellers—relying on PIP's representations as the manufacturer—have incorporated these manufacturer-provided claims into their product listings, unknowingly spreading PIP's deception to end-user customers.

45. On information and belief, distributors and resellers rely on manufacturers to provide accurate environmental claims information. The widespread presence of PIP's false, misleading, and deceptive environmental claims throughout the distribution network demonstrates both the scope of PIP's deception and the resulting competitive harm to Moldex and other competitors.

46. For example, MSC Direct, one of the largest industrial distributors in North America, lists PIP's BioSoft products as "Sustainable Bio-based Earplugs" and "the world's first sustainable bio-based disposable earplug" that "emit 5.6X less CO2 carbon emissions compared to traditional polyurethane-based earplugs" and has even been misled to such a degree by PIP's false, misleading, and deceptive marketing that it states that the products are "biodegradable."[9] MSC's product pages also include PIP's video content featuring the literally false "82% bio-based material" claim and representations that the products are "more environmentally friendly at landfills." MSC presents these environmental claims alongside PIP's detailed product specifications, thereby associating the credibility of a major industrial distributor with PIP's false marketing.

---

[9] *BioSoft Earplugs*, MSC Direct, https://tinyurl.com/2n92uj8y (last visited Dec. 12, 2025).

47.     Similarly, Magid has been misled by PIP's false, misleading and deceptive marketing such that Magid markets PIP's BioSoft earplugs as "Sustainable Biobased Foam Earplugs" that are "Made with sustainable, biobased materials."[10] Magid's listings repeat PIP's claim that the products are "The World's First Sustainable Earplugs" that are "not harmful to the environment when disposed of," emphasizing environmental friendliness as a key product attribute.

PIP BSF-D BioSoft earplugs, the ultimate solution to all your hearing protection needs. Made from sustainable, biobased materials, these blue earplugs are not only eco-friendly but also comfortable to wear. With a Noise Reduction Rating (NRR) of 32, these earplugs provide excellent noise reduction, ensuring that you can work with protection from by external noises. These earplugs are designed to be metal detectable, making them a great option for use in food processing and other industrial settings where metal detection is critical. With their bright blue color and unique design, these earplugs are easy to find, even in low light conditions. The PIP BSF-D BioSoft earplugs are corded, which means that you can easily keep them around your neck when not in use.

These earplugs are made from biobased material, which is a blend of renewable resources that is soft and comfortable to wear. This material is also biobased, ensuring that these earplugs are not harmful to the environment when disposed of.

- USDA Certified 82% biobased materials made in the North America
- The World's First Sustainable Earplugs
- Independently tested NRR 32 / SNR 38

---

[10]     *PIP BSF-D BioSoft Blue Metal Detectable Sustainable Biobased Foam Earplugs NRR 32*, Magid Glove & Safety (under Product Details tab), https://tinyurl.com/yy5bc6kw (last visited Dec. 6, 2025).

-14-

48.    MDS Associates has likewise been misled by PIP's false, misleading, and deceptive marketing.  For instance, the product listing for BioSoft earplugs includes a heading stating, "Biodegradable Ear Plugs Decompose 76% in 180 days," and it also falsely represents that the products have been "certified as eco-friendly or biodegradable."[11]  The BioSoft earplug product listing also includes the false and unsubstantiated "5.6x less CO2 Carbon Emissions than traditional polyurethane foam earplugs" claim.

PIP® PF-1 Pinchfit™ BioSoft™ Push-In Bio-Based Foam Ear Plug - NRR 32 (100ct)

Product Code : 16-PF-1 (GS)

  

**Biodegradable Ear Plugs That Decompose 76% in 180 days**

PIP® Wins 2024 ENVIRONMENTAL PROTECTION NEW PRODUCT OF THE YEAR AWARD for ECOSERIES™ BIOSOFT™ EAR PLUGS

Approximately 15 percent of Americans between the ages of 20 and 69—or 26 million Americans—have hearing loss that may have been caused by exposure to noise at work or in leisure activities. Wearing the proper hearing protection becomes critical to protecting the long term hearing health of your crew.

Get noise-blocking performance with minimal environmental impact. These 2024 Enviromental Protection New Product of the Year Award-Winning, sustainable ECOSeries™ Pinchfit™ PF-1 Single-Use BioSoft™ Push-In Bio-Based Tapered Foam Ear Plugs are the first to be made from bio-based technologies. The BioSoft™ ear plug foam material is made in America and provides the same fit and performance as conventional polyurethane or PVC materials, but with a lower carbon footprint - 5.6x less CO2 Carbon Emissions than traditional polyurethane foam earplugs. This innovative technology not only reduces emissions during manufacturing, but it contains bio-based materials making BioSoft™ more environmentally friendly at end of use.

The tapered shape provides wearers with easy installation while the soft, smooth, low pressure provides excellent comfort. BioSoft™ Eco-friendly ear plugs will decompose 76% on 180 days whereas traditional PU or PVC ear plugs remain unchanged in landfill indefinitely.

- Soft, smooth, low pressure for excellent comfort
- TAA compliant  - Bio-based materials made in North America
- Independently tested NRR 32 / SNR 38
- When stored in its original packaging, BioSoft™ maintains the same shelf life as standard PU foam ear plugs
- Revolutionary design requires no rolling and provides an easier, more hygienic fit
- All parts—the earplug, the cord, the stem, even the bag—are bio-based

49.    PIP has also actively promoted its false environmental claims through industry publications.  AZO Materials, a materials science and engineering publication, published an article titled "Affordable Solutions for Sustainable Hearing

---

[11]    *PIP® PF-1 Pinchfit BioSoft Push-In Bio-Based Foam Ear Plug - NRR 32 (100ct)*, MDS Assocs., https://tinyurl.com/msdfkcau (last visited Dec. 9, 2025).

-15-

Protection" that was "Sponsored by Protective Industrial Products, Inc."[12] The article, for which the "information has been sourced, reviewed and adapted from materials provided by Protective Industrial Products, Inc." repeats PIP's false claims that the products are "Made from 82% bio-based materials" and "decompose by 76% within the same period in an aerobic landfill, emitting as much as 5.6 times less CO2 compared to conventional polyurethane options."

50.   The article also underscores that BioSoft products compete in the foam earplug market, noting that BioSoft earplugs "can be priced at or below the cost of traditional 32 NRR-rated polyurethane foam ear plugs" and provide "the same fit and protection as traditional PU or PVC materials."

51.   By sponsoring content in a reputable materials science publication, PIP leveraged the credibility of industry media to promote its false environmental claims throughout the foam earplug market.

52.   PIP's decision to provide false environmental claims to its distribution partners and to actively promote those claims through industry media—knowing these claims would be repeated to end customers—multiplies the competitive harm to Moldex, as PIP's false claims reach customers through multiple trusted channels rather than just PIP's direct marketing.

53.   The widespread dissemination of PIP's false environmental claims through distribution channels that also carry Moldex products exacerbates the direct competitive injury to Moldex.  When customers browse for foam earplugs on major distributor websites like MSC Direct and Magid Supply, they encounter PIP's false environmental claims while comparing foam earplug products, including Moldex's foam earplugs, within the same category.  In this head-to-head competitive context, PIP's false claims create an illegitimate competitive advantage, misleading

---

[12]   *Affordable Solutions for Sustainable Hearing Protection*, AZoM (Jan. 8, 2025), https://www.azom.com/article.aspx?ArticleID=24192.

-16-

environmentally conscious customers into selecting PIP's falsely advertised products over Moldex's honestly marketed products.

54. PIP's continuous and systematic false advertising campaign, disseminated through its own website and marketing materials, actively promoted through industry publications, and amplified through its distribution network by innocent distribution partners relying on PIP's misrepresentations, demonstrates a calculated strategy to capture foam earplug market share directly from Moldex and other foam earplug manufacturers through greenwashing rather than through legitimate environmental innovation or honest competition.

**E. Moldex Demands the Truth**

55. Unable to compete fairly against PIP's false environmental claims, Moldex was forced to take action. On March 18, 2025, Moldex demanded proof supporting PIP's environmental marketing claims. Ex. A (Moldex's Mar. 18 Letter).

56. Moldex's March 18, 2025 letter specifically identified PIP's problematic claims and cited California Business and Professions Code § 17580(b), California Public Resources Code § 42357(d), and Washington Revised Code § 70A.455.080, which require scientific substantiation for environmental marketing claims.

57. Moldex demanded that PIP provide information and documentation to substantiate the scientific truth and accuracy of each claim by April 15, 2025.

**F. PIP's Evasive and Inadequate Response**

58. PIP responded on April 14. Its response conspicuously failed to substantiate any of its false, deceptive, and misleading environmental claims. Ex. B (PIP's Apr. 14 Letter).

59. Regarding its general, unqualified, and specific "bio-based" and "82% bio-based content" claims, PIP doubled down on its claims, citing independent testing performed by Beta Analytic before PIP acquired Final Fit Safety and the BioSoft product line. The letter did not specify whether the tested products differed from PIP's current commercial BioSoft products.

-17-

60. Regarding its decomposition claims, PIP claimed that a German certification company tested its earplugs from March 2022 to May 2022—before PIP acquired Final Fit Safety and the product line—under EN 13432 (a European industrial standard). PIP represented that the testing resulted in 76.1% mineralization of earplug material after 180 days, which falls short of the EN 13432 requirement of 90% biodegradation within 180 days in commercial composting conditions.

61. PIP provided no substantiation for its carbon emissions claims or comparative environmental benefits—because no such substantiation existed.

## G. Moldex's Continued Pursuit of the Truth

62. Moldex sent a follow-up letter on May 16, 2025, asserting that PIP had failed to provide the requested information and documentation as required by law. Ex. C (Moldex's May 16 Letter).

63. Moldex noted that the testing documents PIP provided were for different products and materials than PIP's commercially offered BioSoft earplugs. Moldex noted that all testing was commissioned by Nanosystems (not PIP or its predecessor) for products labeled "Bio D Foam" or "BioNanopol" tested between 2020–2022. Moldex challenged whether these tested materials were actually the same as PIP's current BioSoft products and demanded evidence proving product equivalency, noting PIP had recently acquired the product line and questioning whether any independent verification had been conducted. Moldex further noted that the testing results showed variability of +/- 3%, which PIP does not disclose in its advertising, and that the bio-based percentage is likely less because the testing was not conducted on stem and cord materials of PIP's earplug products.

64. In response to PIP's documentation of "76% decomposition in 180 days" (based on testing under EN 13432), Moldex challenged multiple critical deficiencies in PIP's marketing claims. *First*, PIP's internal documentation explicitly stated the result "does not meet the limit specified by the UNI EN 13432 standard," yet PIP's advertising suggests that its products are in compliance "when tested in

-18-

accordance with EN 13432" without disclosing this failure. **Second**, Moldex noted the EN 13432 standard is specifically for industrial composting of packaging, not earplugs, and PIP failed to disclose the standard's inapplicability to its products. **Third**, PIP did not test cord and stem components that differ from the earplug material, violating FTC Green Guides requirements that all product materials must decompose similarly. **Fourth**, PIP omitted FTC-required qualifiers about whether products are compostable at home or only in industrial facilities, and if the latter, whether such facilities are available to a substantial majority of consumers. **Finally**, Moldex noted that PIP provided no testing under the ASTM D6400 standard, as required by California Public Resources Code § 42355(d), for decomposition claims.

65. Additionally, despite PIP's marketing claims that it "conducted carbon footprint analyses" demonstrating "5.6 times less CO2 compared to traditional polyurethane foam earplugs" and "17.49 lbs carbon equivalent emissions per 10,000 pairs," Moldex emphasized that PIP failed to provide any actual documentation or evidence supporting these specific carbon emission reduction claims.

66. Regarding PIP's sweeping, unqualified general environmental benefit claims that BioSoft products are "sustainable," "environmentally friendly," "bio-based," "eco-friendly," and supposedly "reduce emissions" and "lower carbon footprint," Moldex pointed out that PIP's limited earthworm and plant toxicity testing cannot substantiate such broad environmental marketing claims. Moldex cited FTC Green Guides, 16 C.F.R. § 260.4(b), warning that such general environmental benefit claims are "highly unlikely" to be substantiated because marketers cannot verify "all reasonable consumer interpretations of these claims."

67. Moldex further noted that PIP's products are neither renewable nor recyclable, and that PIP failed to provide any qualifying statements identifying specific environmental benefits or the specific materials supposedly imparting "eco-friendly" or "sustainable" benefits. Moldex demanded evidence specifically supporting each broad environmental claim.

-19-

**H.     PIP Responds to Moldex's May 16 Letter**

68.     In its July 7 response (Ex. D), PIP made several critical admissions confirming the fraudulent nature of its marketing campaign:

    a.  PIP acknowledged that its 76% decomposition claim "does not meet the 90% threshold for EN 13432 certification" (*id.* at 2);

    b.  PIP conceded that "the presence of petrochemical content in the stem and cord should be clearly disclosed" (*id.*);

    c.  PIP acknowledged that "while internal calculations related to carbon emissions were explored, we have not published or relied upon quantitative carbon emissions claims in public marketing" (*id.*);

    d.  PIP recognized "the importance of avoiding unqualified broad claims" (*id.* at 3).

69.     Remarkably, even while admitting to its deception, PIP attempted to perpetuate the fraud by providing more recent testing data from Beta Analytic supposedly from July 2024 and supposedly on the foam material used in PIP's BioSoft earplug products, which purportedly showed 85–89% biobased content (*id.* at 2).

**I.     Independent Testing Reveals the Falsity of PIP's Advertising**

70.     After receiving PIP's response, in which it admitted it could not substantiate its carbon emissions claims and that its decomposition testing failed to meet required standards—Moldex took the extraordinary step of commissioning independent testing of PIP's products.

71.     Moldex purchased multiple samples of PIP's commercially available BioSoft products from Airgas and Fastenal in July 2025—the same commercial distributors through which industrial customers purchase foam earplugs.  Exs. E–G (Airgas & Fastenal Receipts).  The products tested were commercially available BioSoft products purchased through normal distribution channels, the same products PIP sells to end users, and in the instance of Fastenal, the order was filled and shipped directly to Moldex by PIP itself.  Ex. H.

-20-

72.     Moldex then submitted these samples to Beta Analytic, Inc., the same ISO/IEC 17025:2017-accredited testing laboratory PIP (and its predecessor) claimed to have used for their own testing.  Moldex requested that Beta Analytic test the samples using ASTM D6866-24 Method B, the same radiocarbon testing methodology that PIP relied upon in the testing results it provided to Moldex.  This ensured a direct comparison using the same laboratory, the same testing standard, and the same methodology that PIP itself claimed validated its repeatedly featured "82% bio-based" marketing claims.

73.     To comprehensively test PIP's "82% bio-based" claims, Moldex requested testing of three different sample configurations: (1) foam earplugs alone (without stems or cords); (2) plastic stems alone (without foam); and (3) complete assembled products combining foam earplugs with plastic stems.  This approach was necessary because PIP's own product listings explicitly represent that all product components are bio-based.  On PIP's website, the product listings for BioSoft state: "the earplug, the stem, even the bag-are bio-based."  By testing all three configurations—foam alone, stems alone, and combined products—Moldex could verify whether PIP's representation that all components are bio-based is accurate, and whether PIP's "82% bio-based" claim applies to any component or configuration of the products PIP actually sells to consumers.

74.     Beta Analytic confirmed receipt of the samples on August 5, 2025, and completed testing by August 12, 2025.

75.     Beta Analytic's testing revealed the truth.  The results showed that PIP's commercially available BioSoft products—whether testing foam alone, stems alone, or complete assembled products—contain at best approximately **40%**, and as low as **5%**, bio-based content, dramatically lower than PIP's advertised 82% claim.  Ex. I at 1 (Beta Analytic Results Summary); Exs. J–Q (Beta Analytic Reports Nos. 764988–764995).  The testing revealed significant variations in bio-based carbon content across all sample configurations, but even the highest figures are significantly below,

-21-

and directly contradict, PIP's core marketing claim that the BioSoft products are "82% bio-based."[13]

| Sample # | Beta Report # | Sample ID | Product Configuration Tested | Bio-based Content | Variance from 82% Claim |
|---|---|---|---|---|---|
| 1 (Ex. J) | 764988 | BSB-A | Bullet foam earplug only | 14% | -68% |
| 2 (Ex. K) | 764989 | BSB-B | Bullet foam earplug only | 37% | -45% |
| 3 (Ex. L) | 764992 | BSPFB-A | Pinchfit foam & stem (combined) | 38% | -44% |
| 4 (Ex. M) | 764995 | BSPFB-B | Pinchfit foam & stem (combined) | 11% | -71% |
| 5 (Ex. N) | 764991 | BSPFF-A | Pinchfit foam earplug only | 38% | -44% |
| 6 (Ex. O) | 764994 | BSPFF-B | Pinchfit foam earplug only | 14% | -68% |
| 7 (Ex. P) | 764990 | BSPFS-A | Pinchfit plastic stem only | 40% | -42% |
| 8 (Ex. Q) | 764993 | BSPFS-B | Pinchfit plastic stem only | 5% | -77% |
| **Average** | | | | **25%** | **-57%** |
| **Range** | | | | **5–40%** | |

76. These test results demonstrate that PIP's "82% bio-based" claim is literally false, regardless of how PIP defines its claim. If PIP's "82% bio-based" claim purports to describe only the foam material (as PIP has suggested in correspondence with Moldex), the independent testing of foam-only samples (Samples 1, 2, 5, 6) shows bio-based content ranging from only 14% to 38%—nowhere near 82%.

---

[13] Beta Analytic's measurements of PIP's products demonstrated precision with margins of error ranging from ±0.06 to ±0.15 pMC.

-22-

AMENDED COMPLAINT

77. If PIP's "82% bio-based" claim purports to describe complete assembled products including stems (as PIP's product packaging and marketing materials display), the testing of combined foam-and-stem products (Samples 3, 4) shows even lower bio-based content of only 11% to 38%. Even the plastic stems alone (Samples 7, 8) show bio-based content of only 5% to 40%. No matter which component or configuration is tested, the results are dramatically below PIP's advertised 82% bio-based claim.

78. While PIP acknowledged in its July 7, 2025 letter that "the presence of petrochemical content in the stem and cord should be clearly disclosed," it failed to admit that its foam is primarily petrochemical content and PIP continues to market complete products bearing the unqualified and literally false "82% bio-based" claim without any such disclosures. The testing results demonstrate that whether a consumer purchases foam earplugs alone or complete products with stems, they are receiving products with dramatically less bio-based content than PIP's advertised 82% claim.

79. On information and belief, PIP or its predecessor knowingly submitted different, specially formulated products for testing—products specifically designed to achieve higher bio-based content results—while commercially selling products with dramatically lower bio-based content. The testing PIP originally provided to Moldex from 2020–2022 was conducted before PIP acquired the product line and was commissioned by NanoSystems Inc. (PIP's supplier) on products labeled "Bio D Foam" or "BioNanopol"—not on PIP's current commercially available BioSoft products. Even the testing PIP commissioned in 2024, which it referenced in its July 7, 2025 letter, appears to have been conducted on samples different than the earplugs that PIP currently commercially offers. And PIP has never demonstrated that the

-23-

materials tested in 2020–2022 or 2024 are the same materials in the products it currently sells to consumers.[14]

80.    When consumers purchase earplugs marketed as "82% bio-based" and bearing "eco-friendly" claims—with representations that "the earplug, the stem, even the bag-are bio-based"—they reasonably expect these environmental benefits to be substantiated.  In reality, consumers are receiving products that contain only 5% to 40% bio-based content.  This means they are 60% to 95% petroleum-based.  The dramatic variability across all product components and configurations demonstrates that PIP's "82%" claim is literally false regardless of which product or component a consumer receives.

81.    Moreover, on information and belief, products that are 60–95% petroleum-based will not and indeed cannot decompose 76% in 180 days as PIP claims, much less the 90% required by the EN 13432 standard that PIP advertises in its marketing.

82.    The independent testing results expose the full scope of PIP's deception. PIP's calculated decision to make environmental claims for its products that cannot be substantiated is deliberately false, deceptive, misleading, and designed to capture foam earplug market share from environmentally conscious consumers.

**J.    PIP's False Advertising Causes Direct Competitive Harm To Moldex**

83.    PIP's false advertising—now definitively exposed through independent testing—has caused and continues to cause direct competitive harm to Moldex. Before PIP acquired the BioSoft product line from Final Fit Safety in late 2023, Final Fit Safety was a small competitor without meaningful market share in the foam earplug market.  PIP, by contrast, is a large manufacturer with substantial market presence that has competed with Moldex in the foam earplug market for many years.

---

[14]    *Compare* Ex. D at 5, *with* Pinchfit BioSoft, PIP, https://tinyurl.com/4e7ve2b4 (last visited Dec. 9, 2025).

-24-

84. Moldex has been contacted frequently by distributors or customers inquiring whether Moldex's polyurethane foam earplugs are as environmentally friendly as PIP's BioSoft products, which PIP falsely advertises as 82% bio-based, "the world's first sustainable bio-based ear plug," and "eco-friendly," among other environmental claims. These inquiries directed specifically to Moldex are driven by PIP's environmental marketing claims, positioning BioSoft as environmentally superior to traditional polyurethane foam earplugs sold by Moldex.

85. While Moldex has truthfully explained the environmental attributes of its polyurethane foam earplugs, sales to distributors and customers have been diverted to PIP's BioSoft products as a direct result of PIP's false, misleading, and deceptive environmental claims. Moldex is unable to compete against PIP's false environmental superiority claims, even though PIP's products contain only 5–40% bio-based content and are 60–95% petroleum-based—substantially similar from an environmental standpoint to Moldex's products.

86. For example, on information and belief, Moldex has lost specific sales opportunities where customers explicitly requested whether Moldex offers "biodegradable" or environmentally friendly earplugs like PIP's BioSoft earplug products based on PIP's false environmental marketing, including competitive bids with major industrial customers such as Siemens and Coca-Cola.

87. Moldex's allegations of competitive harm are based on actual market experience and probable market behavior. Moldex has received frequent customer and distributor inquiries comparing the environmental attributes of Moldex's foam earplug products against PIP's falsely advertised BioSoft line. When customers choose PIP's BioSoft products based on these false environmental claims, sales have and will continue to be diverted from Moldex. These inquiries and resulting sales diversions are direct evidence of head-to-head competitive injury to Moldex caused by PIP's false advertising.

-25-

AMENDED COMPLAINT

88.     In the foam earplug market, where different manufacturers' products vie for the same dollars from the same customers and are sold through identical channels to the same customers, PIP's false claims mislead environmentally conscious purchasers into believing they are making an environmentally superior choice by purchasing PIP's BioSoft foam earplug products instead of Moldex's foam earplug products.

89.     The causation between PIP's false advertising and Moldex's competitive injury is direct and straightforward.  For example, PIP's false claims that its BioSoft products contain 82% bio-based content when they actually contain only 5–40% bio-based content create an artificial competitive advantage in the foam earplug market and diverts sales from Moldex and other competitors.

90.     These false environmental claims allow PIP to attract customers who value environmental sustainability and would otherwise select products based on traditional competitive factors such as quality, reliability, performance, and value, factors on which Moldex has built its reputation and fairly competes.  By falsely representing superior environmental benefits, PIP diverts customer interest and sales away from Moldex and other honest competitors.

**K.     Ongoing Fraud and Continuing Harm**

91.     Making matters worse, PIP has continued its false advertising campaign even after being directly confronted by Moldex and after PIP acknowledged in its July 7, 2025 letter that its decomposition claims do not meet EN 13432 certification thresholds, that the presence of petrochemical content in the stem and cord should be clearly disclosed, and stated it would revise its website and marketing materials to ensure claims are "appropriately qualified and not misleading."  Despite these acknowledgements and the filing of Moldex's Complaint detailing numerous false, misleading, and deceptive environmental claims, no material revisions have taken place more than five months after PIP's letter and more than three months after the original Complaint was filed.  Instead, PIP's website continues to make the same

-26-

false, misleading, and deceptive environmental claims, including those PIP itself identified as problematic in its July 7 letter.

92. For example, the landing page for BioSoft has no noticeable differences.[15]



*March 2025*



*Current Version (as of Dec. 9, 2025)*

[15] *Compare* screenshot of the BioSoft landing page from March 2025, *with BioSoft Technology*, PIP, https://tinyurl.com/ucdwe62c (last visited Dec. 9, 2025).

AMENDED COMPLAINT

93.    Likewise, the BioSoft brochure that currently appears on PIP's website is the same version that appeared earlier this year on PIP's website.[16]

*Screenshot from May 22, 2025*

*Screenshot from Dec. 8, 2025*

---

[16]   *See BioSoft Ear Plugs*, PIP (May 2025), https://tinyurl.com/ys6747u2 (can also access on landing page (https://tinyurl.com/ucdwe62c) by clicking "View Brochure").

-28-

94. Thus, the misrepresentations Moldex previously identified are still being parroted by PIP to unsuspecting consumers—notwithstanding independent data that debunks PIP's claims.

95. PIP's continued false advertising, despite its admissions of lack of substantiation, demonstrates a calculated and intentional decision to maintain its illegitimate competitive advantage through ongoing consumer deception.

96. Consumers purchasing PIP's BioSoft products based on environmental claims are being deceived about the true environmental attributes of the products and continue to be victimized by PIP's deceptions.

97. The competitive harm to Moldex described above continues unabated as PIP persists in making the same false environmental claims.

98. Five months after being confronted by Moldex, and despite its own admissions of noncompliance, PIP has failed to timely remove or correct its false and misleading environmental claims, instead choosing to continue deliberately deceiving consumers with its false environmental claims—demonstrating a callous disregard for both the law and consumer protection that demands immediate judicial intervention.

## FIRST CAUSE OF ACTION

### False Advertising & Unfair Competition, Lanham Act § 43(a)

99. Moldex repeats, realleges, and incorporates herein by reference the allegations contained in the preceding paragraphs as if fully set forth here.

100. Section 43(a) of the Lanham Act provides that it is unlawful to use false or misleading statements of fact in connection with goods or services offered in commerce. 15 U.S.C. § 1125(a)(1)(B) states:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities . . . shall

-29-

be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

101.  In selling its BioSoft products, PIP has engaged in, and continues to engage in, false advertising and unfair competition in violation of Section 43(a) of the Lanham Act.  Specifically, PIP falsely advertises its BioSoft products as "82% bio-based," "sustainable," "eco-friendly," "the world's first sustainable bio-based ear plug," and claims they "decompose 76% in 180 days," which constitutes deceptive and misleading representations in violation of the Lanham Act.

102.  On information and belief, PIP's labeling, marketing, sales calls, and product displays at trade shows have misrepresented the nature, characteristics, or qualities of their product by falsely alleging environmental benefits and bio-based content that independent testing has proven to be materially false.

103.  By making such misrepresentations about their product, PIP has engaged in false advertising under 15 U.S.C. §1125(a)(1)(B), and PIP's conduct has created deception among consumers and members of the general public as to the nature, characteristics, or qualities of their products.

104.  On information and belief, PIP's false advertisements were circulated throughout the United States in interstate commerce and falsely misrepresent the nature, characteristics, or qualities of the BioSoft earplugs, or create a substantial likelihood of confusion regarding the nature, characteristics, or qualities of the BioSoft products.  These statements are material, are explicitly and/or impliedly false, and violate 15 U.S.C. § 1125(a)(1)(B).

105.  PIP's false and misleading statements are likely to mislead and deceive consumers into purchasing the BioSoft products instead of Moldex products.  PIP's conduct is willful, deliberate, and in bad faith.

106.  PIP's illegal conduct is continuous and ongoing, and Plaintiff is suffering and will continue to suffer irreparable harm, for which Moldex has no adequate

-30-

remedy at law, unless PIP is enjoined from making false and misleading statements regarding the environmental characteristics of the BioSoft products.

107. As a direct and proximate result of PIP's acts of unfair competition and false advertising, Moldex has suffered and will continue to suffer actual harm to its business, reputation, and goodwill.

## SECOND CAUSE OF ACTION

## Violation of Cal. Bus. & Pro. Code §§ 17200 et seq.

108. Moldex repeats, realleges, and incorporates herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth here.

109. As alleged above, PIP has made and continues to make false and unsubstantiated environmental marketing claims about its BioSoft products, including claims about bio-based content, biodegradability, carbon emissions, and general environmental benefits.

110. As alleged above, independent testing revealed that BioSoft products contain only 5–40% bio-based content, not the advertised 82%, and PIP has admitted it cannot substantiate its carbon emissions claims or broad environmental benefit claims.

111. PIP's practices constitute an unlawful business act in violation of California Business and Professions Code §§ 17200 et seq. because PIP is violating California Business and Professions Code § 17580(b), California Public Resources Code § 42357(d), and the FTC Green Guides by making unsubstantiated environmental marketing claims.

112. PIP's practices constitute unfair, deceptive, untrue, or misleading advertising in violation of California Business and Professions Code §§ 17200 et seq. because it utilizes false or misleading statements and claims about the environmental nature and quality of their BioSoft products.

113. PIP's practices constitute an unfair business act in violation of California Business and Professions Code §§ 17200 et seq. because it is utilizing knowingly false

-31-

or misleading statements and claims about the environmental attributes of its BioSoft products, as demonstrated by PIP's own admissions that its claims lack substantiation.

114. PIP's practices constitute a fraudulent business act in violation of California Business and Professions Code §§ 17200 et seq. because PIP continues to make environmental claims it has admitted are unsubstantiated, likely to deceive members of the public.

115. PIP's practices constitute unfair competition in violation of Business and Professions Code §§ 17200 et seq. because (1) they are unlawful, unfair or fraudulent, and (2) they involve unfair, deceptive, untrue or misleading advertising and other acts prohibited by Chapter 1 (commencing with § 17500) of Part 3 of Division 7 of the Business and Professions Code, including:

a. California Business and Professions Code § 17580.5, which prohibits untruthful, deceptive, or misleading environmental marketing claims, whether explicit or implied, including claims contained in the FTC's Green Guides;

b. California Business and Professions Code § 17580(a) and (b), which require persons making environmental representations to maintain written documentation supporting the validity of the representation and furnish such documentation to the public upon request;

c. California Public Resources Code § 42357(b), which prohibits the sale of products labeled as "biodegradable," "degradable," or "decomposable" unless they comply with specified standards, and § 42357(d), which requires manufacturers to provide compliance documentation within 90 days upon public request;

d. 16 C.F.R. § 260.2, which requires that environmental marketing claims be substantiated by competent and reliable scientific evidence and that marketers ensure all reasonable interpretations of their claims are truthful and supported; and

-32-

e. 16 C.F.R. § 260.4, § 260.8, and § 260.16 (FTC Green Guides provisions regarding general environmental benefit claims, degradable claims, and renewable materials claims).

116. Each sale of PIP's falsely advertised BioSoft products in California constitutes a separate violation of the statutes enumerated above. These violations demonstrate the systematic and pervasive nature of PIP's unlawful practices.

## THIRD CAUSE OF ACTION

## Violation of Cal. False Advertising, Common Law & Cal. Bus. & Pro. Code §§ 17500 et seq.

117. Moldex repeats, realleges, and incorporates herein by reference the allegations contained in the preceding paragraphs as if fully set forth here.

118. PIP's statements regarding the environmental attributes of its BioSoft products, including but not limited to claims that the products are "82% bio-based," "sustainable," "eco-friendly," and "decompose 76% in 180 days," constitute untrue and/or misleading advertising, which it knew or should have known were untrue at the time the statements were made, and therefore violate California Business and Professions Code Section §§ 17500 et seq.

119. PIP's false advertising has injured and continues to injure Moldex with no adequate remedy at law. Moldex is entitled to a permanent injunction prohibiting PIP's wrongful conduct.

120. Each sale of PIP's falsely advertised BioSoft products in California constitutes a separate violation of the statutes enumerated above. These violations demonstrate the systematic and pervasive nature of PIP's unlawful conduct and support Moldex's claims for injunctive relief and restitution.

-33-

AMENDED COMPLAINT

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

i.      Enter judgment in favor of Moldex and against PIP on all causes of action;

ii.     Enter judgment that PIP has competed unfairly pursuant to the Lanham Act, 15 U.S.C. § 1125(a), and the common law, and be permanently enjoined from continuing such conduct;

iii.    Enter judgment that PIP has competed unfairly under California Business and Professions Code §§17200, et seq. and advertised falsely under §§ 17500, et seq.;

iv.     Issue a preliminary and permanent injunction, pursuant to California Business and Professions Code § 17203, enjoining PIP from any further act of unfair competition;

v.      Issue a preliminary and permanent injunction requiring PIP to issue corrective advertising to remedy consumer deception caused by its false environmental claims and to require PIP to notify its distributors and retailers of the falsity of its environmental claims and to recall all marketing materials containing false claims;

vi.     Award Moldex its actual damages in an amount to be proven at trial; and

vii.    Grant such other and further relief as this Court may deem just and proper.

## **REQUEST FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues.

AMENDED COMPLAINT

Dated:  December 12, 2025

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: /s/ *Joseph M. Paunovich*
Joseph M. Paunovich (Bar No. 228222)
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443-3000
Fax: (213) 443-3100
joepaunovich@quinnemanuel.com

Kade A. Allred (*pro hac vice*)
kadeallred@quinnemanuel.com
2755 E. Cottonwood Pkwy., Suite 520
Salt Lake City, UT 84121
Telephone: (801) 515-7300
Fax: (801) 515-7400

*Attorneys for Plaintiff Moldex-Metric, Inc.*

-35-